IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
BEAUMONT DIVISION

| | |
|---|---|
| **PHILIP SNEAD** § | |
| § | |
| **Plaintiff,** § | |
| § | |
| v. § | CIVIL ACTION NO. _____ |
| § | JURY TRIAL |
| **CITY OF KOUNTZE, TEXAS** § | |
| § | |
| **Defendant.** § | |

**PLAINTIFF'S ORGINAL COMPLAINT**

TO THE HONORABLE U.S. DISTRICT JUDGE:

Plaintiff PHILIP SNEAD files this Original Complaint against Defendant CITY OF KOUNTZE, TEXAS, and would show the Court and Jury the following in support thereof:

## I.
## PARTIES

1. Plaintiff PHILIP SNEAD is a citizen of Texas, and resides in Angelina County, Texas.

2. Defendant THE CITY OF KOUNTZE is a municipality located in Hardin County, Texas, that operates the Kountze Police Department, and may be served through its City Administrator, Tim Drake, at 1025 N, Pine, Kountze, Texas 77625. *Service is hereby requested at this time.*

## II.
## JURISDICTION AND VENUE

3. As this case is brought pursuant to 42 U. S.C. §1983, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331.

4. This Court has general personal jurisdiction over Defendant City of Kountze because it is a Texas municipality located within this Division and District.

5. This Court has specific *in personam* jurisdiction over Defendant, because this case arises out of conduct that caused injury to Plaintiff that occurred within the Eastern District of Texas.

### III.

### FACTS

6. January 28, 2022, Philip Snead (hereinafter referred to as "Philip" or "Plaintiff") drove through the City of Kountze (hereinafter referred to as "Defendant" or "Kountze") in his Dodge van.

7. Plaintiff drove through Kountze northbound on highway 69.

8.. Plaintiff drove through Kountze around 7:30 PM or so. It was a Friday night and quite dark.

9. Plaintiff was driving for business purposes.

10. Philip is a funeral director and been requested by Angelina County, Precinct 1, Justice of the Peace Billly S. Ball to transport the body of a baby, who had passed away far too young, to the Jefferson County Morgue for an autopsy. Philip had completed that assignment, and was returning to his home in Lufkin, Texas, as he drove through Kountze.

11. Plaintiff's father accompanied Philip on the trip as a passenger. Philip's father was 90 and suffered from Alzheimer's.

12. Plaintiff drove carefully throughout the trip, obeying traffic laws.

13. Philip would, of course, check his rear-view mirror from time to time. As he was driving through Kountze and checking his rear view, a large pickup-like vehicle caught his attention, because it was running up on him at a high rate of speed. That vehicle was moving much faster than Philip's van and all other traffic.

14. Attempting to move away from the speeding vehicle behind him, Philip drove passed an 18-wheeler, and, when he could safely do so, moved into the right lane ahead of the 18-wheeler.

15. Looking in his rear-view mirror, Philip saw the large pickup-like vehicle aggressively swerve right behind him. It continued to move much faster than Plaintiff's van and came dangerously close to the rear bumper of Plaintiff's van.

16. The large pickup-like vehicle continued to follow aggressively as Philip reached and stopped at a red light.

17. When the light turned green, Philip drove through the intersection, and the pickup-like vehicle tailed him even more closely.

18. The fast and aggressive movement of the pickup-like vehicle made Philip fear the driver following him intended to hit his van or did not care whether he or not he did so.

19. Plaintiff, then, reached and stopped at a second red light. When the light turned green, Philip accelerated to the speed limit, hoping the driver stalking his van would back off and leave. He did not. Instead, the pickup-like vehicle stayed way too close Plaintiff's van for miles.

20. The pickup-like vehicle stayed so dangerously and recklessly close to Philip's van, regardless of the speed, that Philip could do nothing other than concentrate on controlling his van and head for the nearest well-lit town—Woodville, Texas. Plaintiff knew the Sheriff's Office was just north of Woodville. Plaintiff's goal was to make it there before the stalking vehicle or its driver caused an accident or otherwise gravely harmed him and his father.

21. Attempting to call 911 or do anything other than use his hands to control his old van, was too dangerous.

22. Plaintiff feared for the lives of his father and him. If he stopped or reduced his speed, the pickup-like vehicle would have crashed into his van.

23. Plaintiff believed the driver of vehicle behind him was crazy, and he and his father were, at the very least, road rage targets.

24. Plaintiff now knows the pickup-like vehicle behind him was a Kountze Police unit (hereinafter referred to as the "pursuing vehicle') driven by Kountze Police Officer Robert P. Crossman (hereinafter referred to as the "pursuing officer").

25. The pursuing vehicle had no emergency lights visible to Plaintiff.

26. The pursuing vehicle's emergency lights were never visible to Plaintiff at any time.

27. In fact, Plaintiff knows that the emergency lights on at least the front of the pursuing vehicle were never on during the pursuing officer's lengthy race at Plaintiff's vehicle.

28. As Plaintiff desperately tried to make it to Woodville, he saw a car with overhead lights sitting in the dark far off the shoulder of the road just passed the Village Mills Creek bridge. Plaintiff slowed down a bit, hoping some help may be on the way, but the pursuing vehicle continued to run fast at him.

29. Further down highway 69 was a small town called Warren, Texas. When approaching Warren, Philip saw two cars with red and blue lights, one off each side of the bridge parked with their taillights facing him. Philip slowed down, thinking an accident may have occurred or he might get some help.

30. Instead, Plaintiff realized a tire had blown on his van. Trying to bring his van to a controlled stop in a relatively safe area, Plaintiff went forward a few hundred yards and turned his van into a pretty well-lit Exxon store. He stopped.

31. When he brought his van to stop, Philip opened his door and saw a DPS Trooper pointing a gun at him from the road, using his car as a shield. Philip heard loud cursing ordering him to the ground. Plaintiff complied.

32. Plaintiff repeatedly told all law enforcement present that he had a gun in the van, and a CHL permit. He wanted them to make sure they knew this.

33. While Philip was face down on the ground, the pursuing officer yelled that Philip was under arrest for a felony.

34. The pursuing officer roughly hand cuffed him.

35. Plaintiff eventually learned the pursuing officer was with Defendant's police force.

36. Philip also learned the pursuing officer claimed he initiated the pursuit because, even though that officer had no equipment to measure the speed of vehicles, he felt Philip was driving 8 or so mile over the speed limit while in Kountze.

37. The pursuit lasted more than 18 miles.

38. The pursuit continued outside the jurisdiction of Kountze, and outside Hardin County jurisdictional limits.

39. At no time during the pursuit, did the pursuing vehicle have visible emergency lights on.

40. Early in the pursuit, Kountze police learned and knew that the Philip's van was properly registered, and they learned and knew Philip's address by running his tags.

41. Kountze police had no reasonable suspicion that Philip committed any crime or posed any danger to himself, law enforcement, or others.

42. Kountze police consider no options less dangerous than a lengthy high-speed chase on a very dark night through miles of road with poor lighting and few people.

43. As the pursuing officer was in continuous communication with Kountze police, his supervisors and the Chief of Kountze police could have, but did not, intervene at any time to deescalate, terminate, or order options more reasonable than a reckless and irresponsible high-

speed pursuit that endangered Plaintiff, his father, the pursuing officer, and any one else who was a potential victims of a senseless car crash.

44. During the pursuit, the pursuing officer was in constant radio communication with Kountze police. The Chief of the Kountze police and Kountze police supervisors who knew of the pursuit approved and ratified it, offering no orders nor instructions nor even common-sense suggestions about alternatives to handling a supposed minor traffic violation in manner other than use of excessive and unnecessary force.

45. At the Exxon station where Plaintiff was able to stop his disabled vehicle safely, Philip saw a DPS Trooper standing and looking around. This trooper confirmed to Philip that emergency lights on the front of the pursuing vehicle were not on.

46. The pursing officer told the Kountze Chief of Police that he had previously experienced electrical issues with pursing vehicle.

47. Plaintiff was detained in handcuffs and frisked.

48. Philip knew his heart was in A fib, and his blood pressure was running high. He requested EMS.

49. Plaintiff's dad was 90 years old and suffered from Alzheimer's. Nevertheless, he was left outside the van, standing in the cold, while law enforcement from numerous jurisdictions milled about talking to one another. hen Plaintiff was at the scene of his seizure and detention, no officer showed any concern about Plaintiff's dad,

50. While handcuffed, Plaintiff reached into his front pocket and called his son, Aaron Snead, who was also a law enforcement officer. Seeing this call, Philip was ordered to get out of the police unit and was frisked.

51. The City of Kountze Chief of Police, JB Slaughter, arrived, and asked Plaintiff for his ID. Plaintiff told him it was in his wallet. Chief Slaughter took my wallet and checked his ID. After several minutes, the Chief of Defendant's police department told Philip there had been a mistake.

52. Plaintiff left in the ambulance to Tyler County Hospital in Woodville, Texas. Plaintiff was in A fib with RVR and blood pressure of 167/125.

53. Philip was forced to leave his dad alone at the Exxon store.

54. Philip's wife, Vicky Snead, drove to the scene from Lufkin, Texas. Her drive was a little over an hour. When she arrived at the Exxon store, she spoke with Kountze Police Chief JB Slaughter who said no charges would be filed.

55. Plaintiff now knows that the pursuing officer had, with the knowledge and permission of his supervisors, including Defendant's Chief of Police, initiated a vehicular pursuit of Plaintiff at the time Plaintiff first observed the pursuing vehicle in his rear-view mirror.

56. As plaintiff was not engaged in any unlawful activity, the pursuing officer initiated his wrongful vehicular chase without a warrant, without reasonable suspicion that Plaintiff had committed any crime, and without probable cause to support pursuing or detaining Plaintiff.

57. The pursuit was initiated even though Plaintiff posed no manner of danger to anyone.

58. Plaintiff reasonably thought the pursuing vehicle, when he first noticed the large vehicle behind him, was being driven dangerously either recklessly or intentionally, and began to fear for his safety and the safety of his father. Nothing, within Plaintiff's ability to see to the rear of his van indicted the pursuing vehicle was driven by a law enforcement officer. Plaintiff had no reason to evade law enforcement and did not do so. Quite the opposite, Plaintiff believed he may have become the target of an impaired driver intent on some form of road rage.

59. Plaintiff now knows he had run over strip designed to blow out his tires. The strip was requested by the Kountze police with the knowledge of the pursuing officer's supervisors, including the Defendant's Chief of Police.

60. Plaintiff now knows that the pursuing officer kept his supervisors, including the Chief of Police, advised from the initiation of the pursuit, and throughout the pursuit by maintaining constant radio contact with the Defendant police that detailed the pursuit activity.

61. The Chief of Police, Defendant's police policymaker, and the pursuing officer's supervisors ratified the dangerous high-speed chase that went on for miles on a dark night, and continued through multiple jurisdictions. The chase was approved and ratified without any attempts to de-escalate or terminate it. No safer options were considered or even suggested by anyone connected with Defendant.

62. The policy and practice of Defendant, therefore, is clear: A Kountze police officer can conduct a dangerous high-speed pursuit without suspicion that any significant crime was committed by the pursued and without considering de-escalation or termination of chase even when the pursued vehicles plates had been run and the address of the pursued vehicles owner was known.

63. Philip filed a formal complaint about the above-described events. Though requested, defendant failed to produce any documentation that an investigation occurred.

64. Despite Philip's complaint, he received no indication that policies, training, or supervision changed at all as a result the "mistake" that violated Plaintiff's Fourth and Forteenth Amendment rights. Defendant was, based on available evidence, indifferent to the pursuit policy followed by the pursuing officer and adopted and ratified by Defendant's Chief of Police,

## IV.
## CLAIMS

### §1983 *MONELL* CLAIM AGAINST CITY OF KOUNTZE, TEXAS, UNDER FEDERAL LAW

65. Plaintiff incorporates by reference all of the foregoing and further alleges as follows:

66. Defendant, acting under color of law, employed policies, and permitted practices that caused violations of Plaintiff's constitutional rights. Specifically, Defendant employed policies and practices that permitted initiation of a vehicular pursuit at the sole discretion of a single patrol officer; permitted the patrol officer at his sole discretion to escalate the initial pursuit into a high speed chase; permitted the patrol officer at his sole discretion to pursue Plaintiff's vehicle at dangerous speeds for an unlimited time; permitted the patrol officer at his sole discretion to continue the high speed chase for a substantial period of time; permitted the patrol officer at his sole discretion to continue the high speed pursuit of the Defendant outside the jurisdictional boundaries of the Defendant, and outside the jurisdictional boundaries of the county in which the Defendant is located; permitted the patrol officer to conduct the pursuit without regard to the seriousness of any potential unlawful conduct of the pursued; without consideration of de-escalation or termination of the pursuit; without active input from any supervisor: without consideration of the pursuit worthiness of the pursuing vehicle, including whether or not the vehicle's emergency lights were reliable; and without properly training the pursing officer,

67. All of the above was initiated and permitted to continue, without reasonable suspicion that Plaintiff had committed an offense of any significance or other constitutionally acceptable justification. In this manner, and through these policies and practices, Defendant used excessive and unreasonable force in pursuing, detaining, and seizing, Plaintiff. Defendant's policies and

practices were the moving force in causing physical injury to Plaintiff and violating his Fourth and Fourteenth Amendment federal constitutional rights.

68. Defendant investigative policies and practices, as reflected in its failure to conduct any meaningful investigation of Plaintiff's formal complaint about the events described above, ratified, endorsed, permitted, and encouraged the violation of Plaintiff's federal constitutional rights described above.

69. Though properly requested, Defendant has failed to produce any documentation of any investigation or claim that it has any such documentation. The failure to investigate the above-described events further evidence Defendant's ratification of conduct that violated Plaintiff's rights protected by the federal constitution.

70. Defendant's policies and practices related to training, and supervising its patrol officers who engage in high-speed vehicular pursuits were moving forces in the violation of Plaintiff's rights protected by the federal constitution.

71. Defendant's effort to shift all fault to the pursing officer evidences the deficiencies of its training and supervision policies and practices. Defendant's Chief of Police told Plaintiff that Defendant vehicle that pursued Plaintiff had working emergency lighting, but the failure to engage them during the pursuit was an error by the patrol officer. Defendant, however, has no documentation that it knows, or even attempted to investigate, why the patrol officer did not engage the emergency lighting correctly. Nor has Defendant any documentation that it disciplined the involved patrol officer. Defendant's Police Chief did communicate that the patrol officer was no longer with Defendant, but no documentation indicates the patrol officer's departure was related to any of Defendant's effort to investigate or remediate the pursuit and detention of Plaintiff.  This

underlines the Defendant's policies and practices that permit and encourage senseless and dangerous high-speed pursuits.

72. The high-speed vehicular pursuit of Plaintiff and the seizure of Plaintiff by Kountze Police constituted excessive force in violation of the United States Constitution, as incorporated through the Fourteenth Amendment.

73. At all material times, Kountze Police acted under color of state law, as agents of Defendant.

74. At all material times, Kountze Police acted within the course and scope of their duties as police for Defendant.

75. Defendant's policymaker for all matters related to the Kountze Police Department was the Chief of Police.

76. Defendant had and/or ratified the following policies and/or practices in place when Plaintiff was wrongly pursued and seized.

A. Failing to train its patrol officers and supervisors in initiating, conducting, and monitoring the progress of high-speed vehicular pursuits.

B. Failure of Defendant police supervisors to actively oversee and manage on-going lengthy high speed vehicular pursuits that extend beyond the jurisdictional limits of Defendants police department.

C. Ratification of conduct that violates the rights of citizens with whom Defendant's police commonly encounter by approving the misconduct, permitting the misconduct to occur without any active monitoring or intervention, and the failure to investigate complaints of misconduct and take appropriate action, including, but not limited to, corrective training of officers and supervisors, officer and supervisory disciple, and adoption of needed policy and practice changes.

77. Each of the policies and practices delineated above was actually known, constructively known and/or ratified by Defendant and its policymakers and was promulgated with deliberate indifference to Plaintiff's Fourth and Fourteenth Amendment rights under the United States Constitution. Moreover, the known and obvious consequence of these policies was that Defendant's police would be placed in recurring situations in which the constitutional violations described within this complaint would result. Accordingly, these policies also made it highly predictable that the particular violations alleged here, all of which were under color of law, would result.

78. Defendant violated Plaintiff's constitutional rights when Defendant failed to supervise and/or train the Kountze Police Officer in the manners set forth above, all of which caused the violation of Plaintiff's constitutional rights. The Kountze Chief of Police was deliberately indifferent to the known and obvious consequences of these policies, practices, and customs which he was aware of, authorized, and encouraged, rather than acting to correct them. The Kountze Chief of Police was actually aware of facts from which any reasonable policymaker could draw the inference that a substantial risk of serious harm and violations of constitutional rights existed, and actually drew that inference. It was apparent and obvious that a constitutional violation was a highly predictable consequence of the County's above delineated policies, including failures to train.

79. Likewise, the Kountze Chief of Police knew that the failures to train as set forth above were all particular omissions in the Defendant's police training program that would cause Kountze Police's employees to violate the constitutional rights of members of the public they encountered, like Plaintiff. Nevertheless, though the Kountze Chief of Police knew of these obvious deficiencies, he chose to retain this dangerously flawed training program.

80. Consequently, the policies delineated above were a moving force of Plaintiff's constitutional deprivations and injuries, and proximately caused severe damages.

81. Defendant investigative policies and practices, as reflected in its failure to conduct any meaningful investigation of Plaintiff's formal complaint about the events described above, ratified, endorsed, permitted, and caused the violation of Plaintiff's federal constitutional rights described above. Though properly requested, Defendant has failed to produce any documentation of any investigation or claim that it has any such documentation that it is withholding for any reason. The failure to investigate the pursuing officer evidences that the patrol officer who pursued Plaintiff for many miles at dangerously high speeds without proper justification, worked in an environment that condoned and encouraged conduct that violated rights protected by the federal constitution.

## V.
## JURY DEMAND

82. Pursuant to Federal Rule of Civil Procedure 48, Plaintiff hereby requests a jury trial.

## VI.
## PRAYER FOR RELIEF

83. Accordingly, Plaintiffs ask that judgment be awarded against Defendant for

1) Compensatory damages against Defendants;

2) Punitive damages;

3) Attorneys' fees, including reasonable and necessary expenses such as expert fees, pursuant to 42 U.S.C. § 1988;

4) costs of court;

5) judgment at the highest rate allowable under the law; and,

6) all other relief to which Plaintiff is justly entitled.

Respectfully submitted,

**/s/ Jack E. Urquhart**
**Jack E. Urquhart**
State Bar No. 20415600
Email: jack.urquhart47@gmail.com
Jack E. Urquhart Attorney At Law
1302 Waugh Drive, No. 880
Houston, TX 77019
(832) 723-2201

**ATTORNEY FOR PLAINTIFF**
**PHILIP SNEAD**